## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

| | | |
|---|---|---|
| ROBERT BREARLEY, | ) | |
| ROBERT L. SMITH, III, | ) | |
| and ACCESS WITH SUCCESS, INC. | ) | |
| | ) | |
| **Plaintiffs** | ) | |
| | ) | **CIVIL ACTION NO.: 05-10411-RBC** |
| | ) | |
| **v.** | ) | |
| | ) | |
| CITY OF METHUEN, | ) | |
| MASSACHUSETTS | ) | |
| | ) | |
| **Defendant** | ) | |

_____)

### JOINT MOTION FOR APPROVAL AND ENTRY OF CONSENT DECREE

The parties respectfully move for entry and Court approval of the Consent Decree

attached hereto as Exhibit A.  As grounds for their motion, the parties rely upon the facts

and reasons set forth in the accompanying memorandum.

WHEREFORE, the parties pray that their motion will be granted.

Respectfully submitted,

| PLAINTIFFS ROBERT BREARLEY, ET AL., | DEFENDANT CITY OF METHUEN, |
|---|---|
| By their attorneys, | By its attorneys, |
| | |
| _/s/ Nicholas S. Guerrera_____ | __/s/ Michele E. Randazzo_____ |
| Nicholas S. Guerrera (BBO #551475) | Michele E. Randazzo (BBO #564906) |
| Shaheen, Guerrera & O'Leary, LLC | Kopelman and Paige, P.C. |
| Jefferson Office Park | 101 Arch Street |
| 820A Turnpike Street | Boston, MA  02110 |
| North Andover, MA  01845 | (617) 556-0007 |
| (978) 689-0800 | |

## <u>CERTIFICATION OF COUNSEL PURSUANT TO LOCAL RULE 7.1(A)(2)</u>

The undersigned counsel for the plaintiffs hereby certifies that the parties are in complete agreement with regard to the issues presented in the accompanying motion.

Dated: March 17, 2006        /s/ Nicholas S. Guerrera
                                   Nicholas S. Guerrera

277064/METG/0628

### POWER OF ATTORNEY

KNOW ALL PERSONS that I, Amylee O' Beirne, hereby grant to my attorneys, Nicholas S. Guerrera, of Shaheen Guerrera & O' Leary, LLC, Jefferson Office Park, 820A Turnpike Street, North Andover, Massachusetts, 01845 full power and authority to prepare, endorse, execute and file on my behalf, all complaints, claims, contracts, drafts, settlement agreements, consent decrees, and other documents which, in his opinion are necessary in connection with the prosecution and resolution of the Title II ADA cases in which Access with Success, Inc, is named as a plaintiff.

Amylee O'Beirne
Dated: 12 - 28 - 05

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **ROBERT BREARLEY,** **ROBERT L. SMITH, III,** **and ACCESS WITH SUCCESS, INC.** | ) ) ) ) ) | |
| **Plaintiffs** | ) ) ) | **CIVIL ACTION NO.: 05-10411-RBC** |
| **v.** | ) ) ) | |
| **CITY OF METHUEN,** **MASSACHUSETTS** | ) ) ) | |
| **Defendant** | ) ) ) | |

## CONSENT DECREE

This CONSENT DECREE is made and entered into by and among Robert Brearley, Robert L. Smith, III, and Access With Success, Inc., acting by and through their attorney, Nicholas S. Guerrera, Shaheen, Guerrera & O'Leary, L.L.C. (hereinafter the "plaintiffs"), and the City of Methuen, (hereinafter the "defendant" or the "City" or "Methuen"). The City of Methuen, Robert Brearley, Robert L. Smith, III and Access with Success, Inc. are sometimes hereinafter referred to as the "Parties".

### WITNESSETH:

WHEREAS, this is an action seeking injunctive, declaratory and equitable relief pursuant to Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.,* Article 114 of the Massachusetts Constitution, Massachusetts General Laws, chapter 93, § 103 and Section 504 of the Rehabilitation Act. 29 U.S.C. § 794;

1

WHEREAS the ADA applies to the City because it is a "public entity" as defined by Title II, 42 U.S.C. § 12131(1);

WHEREAS, there is pending before the United States District Court for the District of Massachusetts, this action captioned *Robert Brearley, et al., v. City of Methuen, Massachusetts*, Civil Action No. 1:05-cv-10411-RBC (hereinafter the "litigation"); and

WHEREAS, the pending litigation involves claims contested by the defendant, and defenses contested by the plaintiffs; and

WHEREAS, the parties now desire permanently and fully to settle, resolve and conclude the litigation and all disputes, claims and defenses which were or could have been included in the litigation without the burdens and expenses of further litigation and trial;

WHEREAS, the parties have conferred in good faith and agree that the pending litigation should be settled without the need for trial; and

WHEREAS, the parties acknowledge and agree that this Consent Decree is not intended to be, and shall not be construed or represented to be, evidence of, or an admission of liability, on the part of the defendant as to any claim in the litigation, or evidence or an admission by the plaintiffs that the measures taken by the City of Methuen hereunder constitute an adequate remedy for the violations of federal law alleged in the Complaint; and

WHEREAS, this Consent Decree is understood by the parties to be an amicable resolution of genuinely disputed claims;

2

NOW THEREFORE, in consideration of the promises hereinbefore set forth, and the mutual and reciprocal covenants and agreements herein provided, it is AGREED and ORDERED by the Court as follows:

## A.    PROGRAM ACCESSIBILITY AND BARRIER REMOVAL

I.    The City shall continue to increase the accessibility and usability of its facilities, programs and services for persons with disabilities and complete all such work within the specific deadlines designated herein, unless the parties agree to a written extension of time to complete necessary work.  The work to be performed by the City under this Consent Decree shall include physical alterations to City facilities, public sidewalks and roadways, the development of policies and procedures that ensure information and materials are made available to persons with disabilities in the provision of City services and activities, and the designation of City staff to oversee and coordinate the City's projects to comply with this Consent Decree, Title II of the ADA, the General Laws of Massachusetts and the Code of Massachusetts Regulations, 521 C.M.R. § 1, et seq.

II.    With regard to all streets, roads, or walkways, over which the City has responsibility and authority, the City shall engage in the process identified in Section C.1, below, and develop a transition plan to include a schedule for providing curb ramps or other sloped areas where pedestrian walks cross curbs, giving priority to walkways serving entities covered by the Title II of the ADA, including State and local government offices and facilities, transportation, places of public accommodation, and employers, followed by walkways serving other areas.  *28 C.F.R.   § 35.150(d)(2).*

III.    The parties acknowledge and agree that where construction of, or physical alteration to an existing facility, is required, such construction or alteration shall be

performed in compliance with the ADA Accessibility Guidelines ("ADAAG" standards) or the Uniform Federal Accessibility Standards ("UFAS"), and the Massachusetts Architectural Board standards ("MAAB" standards), where applicable and specifically identified in this Consent Decree.

IV.    Removal of structural barriers for persons with disabilities shall comply with ADAAG or UFAS, unless compliance is technically infeasible, or in the case of MAAB standards, where compliance is impracticable, the parties have agreed or will agree to departures from ADAAG or UFAS, and will cooperate in the request for necessary variances from the MAAB, and the use of alternative methods to provide equivalent accessibility as identified in this Consent Decree.  The City may ensure program access through methods other than structural changes in existing facilities if such other methods are effective in providing program access.

V.    In alterations to facilities to remove structural barriers, if compliance with ADAAG or UFAS standards is technically infeasible, or where compliance with MAAB standards is impracticable, the parties agree that such alterations shall still provide accessibility to the greatest extent feasible.  "Technically infeasible" means, with respect to an alteration or barrier removal project, that the alteration has little likelihood of being accomplished because existing structural conditions would require relocation or significant alteration of a load-bearing member which is essential to the structural frame; or the relocation of plumbing fixtures that would require the relocation of supply lines or waste lines that are encased in a concrete slab.

VI.    In those circumstances where City officials believe that the proposed action would fundamentally alter the service, program, or activity in question or would result in

undue financial and administrative burdens, the City shall have the burden of proving that

compliance with *28 C.F.R. § 35.150(a)* would result in such fundamental alterations or

burdens. The Mayor must make the decision that compliance would result in such

alteration or burden after considering all resources available for the funding and operation

of the program, service, or activity. A written statement of the reasons for the decision

must accompany the Mayor's decision.

VII.    The barrier removal, alterations and modifications required hereby shall be

completed in all respects within the time specified in this Consent Decree, unless

otherwise agreed to in writing by the parties. The time for completion by the City shall

be subject to acts of God, *force majeure*, or events beyond the control of the City such as

the inability to obtain permits from permitting officials, failure of building inspectors to

complete inspections, contractor defaults or work stoppages. In the event of unforeseen

circumstances, to include acts of war, vandalism, arson, or terror, or the failure of the

City to have adequate funds appropriated to complete the necessary work under this

agreement, the time for completion of the barrier removal provided for hereby shall be

extended by the number of days reasonably attributable to such delay-causing event as

long as the City makes good faith efforts to effect implementation as soon as reasonably

possible thereafter, in which case the plaintiffs' attorney, Nicholas S. Guerrera, shall be

notified in writing of the action to be taken in light of the delay-causing event. Any

disagreement between the parties that may arise under such circumstances shall be

subject to the Enforcement Provisions set forth in Part D below.

**B.**    <u>**NON-STRUCTURAL ACTIONS TO BE PERFORMED**</u>

I.    **Notification to the Public:**  The parties agree that the City shall take affirmative steps to comply with the notification requirements of the ADA, to increase the amount of information made available to the public about the accessibility of City facilities, services, events and programs for persons with disabilities, the provision of auxiliary aids and services to assist disabled persons, and the names and locations of designated City staff who are responsible for addressing the requests and complaints regarding accessibility to City facilities, events, services, and programs.  The parties agree that the City shall perform the following specific actions within **Nine (9) months** of entry of this Consent Decree.

> a)    **Accessibility of Parks and Recreational Facilities and Services:**
> The City shall provide information to all interested persons about the accessibility of City facilities in all published materials.  This information shall identify the location of all accessibility features provided by the City at its parks and recreational facilities, such as the location of disabled parking, location of accessible restrooms and amenities, and the location and availability of special features to assist disabled persons.  The City shall also inform the public of all parks and recreational facilities that do not provide full access for persons with disabilities with information directing interested persons to alternative locations where full accessibility is provided.

> b)    **Event Notification:**  The City will improve its written communications with the public with respect to the City's ADA policies and procedures, by: Including in all published announcements of City sponsored events contact information for the individual(s) to whom members of the public may contact to request reasonable accommodations (including handicapped seating for City sponsored events where event seating is made available), as well as the time frame for such requests (typically two weeks prior to the event).  This information shall be included on all published announcements for which the City has control over the contents of the publication.  The City will disseminate sample language to all City committees, boards, commissions, and departments for inclusion on public notices.

c) **Alternative Formats of City Materials:** On all published materials that the City makes available to the public (e.g., newsletters, notices, calendars), the City shall include a statement that such materials can be provided in alternative formats for the blind or visually impaired, upon request. The City shall not impose any additional charge for the preparation of such materials.

d) **Employment Notices:** On all published materials regarding the City's employment application process, the City shall include language on the City's employment notices that individuals requesting accommodations in the application process may contact a designated City representative for assistance.

**II.     ADA Grievance Procedures:** Under 28 C.F.R. § 35.105, a City having 50 or more employees is required to designate a responsible employee and adopt grievance procedures. Similar requirements are found in the Section 504 regulations for federally assisted programs [*e.g.*, 45 C.F.R. § 84.7(b)]. Therefore, within **Nine (9) months** following the entry of this Consent Decree, the City shall Revise its ADA grievance procedures to name the current ADA Coordinator and provide contact information for the ADA Coordinator, and post the City's grievance procedures on City bulletin boards where public notices are routinely posted, such as outside the City Clerk's office. The City shall notify and train all staff that regularly receives communications from the public to readily direct all requests and/or complaints regarding disability access to the City ADA Coordinator.

**III.     Designation of ADA Coordinator:** Within **Nine (9) months** of the entry of this Consent Decree, the City shall designate a knowledgeable staff person to serve as "ADA Coordinator" to advise the Mayor and coordinate its efforts to comply with this Consent Decree. Currently, the City's designated ADA coordinator is Gene Walsh.

7

**IV.    Maintenance of Accessible Features:** The City shall promptly repair and maintain in operable working condition all equipment and features of facilities that provide accessibility for persons with disabilities.

**V.    Communications:** Within **Nine (9) months** of the entry of this Consent Decree the City shall take appropriate steps to ensure that its communications with applicants, participants, and members of the public with disabilities are as effective as communications with others. The City will provide more prominent dissemination and posting of the City's ADA Policy Information, in regard to requests for auxiliary aids. The City's ADA Policy Information sheet shall be revised to be more specific in terms of to whom requests for auxiliary aids (including alternative formats for documents) should be directed. In addition, the following specific tasks shall be performed:

     a)    **TTY Telephone Service:** The City shall ensure that all TTY numbers for City offices are published in all City phone directories. The City shall take steps to ensure that all appropriate employees are trained and practiced in using a TTY and/or the Massachusetts Relay Service to make and receive calls, and will specifically take steps to ensure the dispatch center employees understand how to operate the TTY (TDD) system, including proper referral of fire-related calls to the fire department. The City will ensure that its' TTY units are maintained in good working order through test calls at least annually, and whenever reports of malfunction are made.

     b)    **Sign Language Interpretation:** The City shall establish procedures providing for the prompt procurement of qualified interpreting services (not language interpreting services) for all public meetings of City government, or for all City programs, events, or activities upon request, at the City's expense. If the City is unable to provide sign language interpreters because of an unavailability of such interpreters, or other reasons beyond the control of the City, the City will notify the individual requesting interpreting services as soon as possible.

     c)    **Auxiliary Aids & Services:** The City shall provide appropriate auxiliary aids and services when necessary to provide effective communication and shall give primary consideration to the requests of

persons with disabilities when determining the form of auxiliary aid to be provided. The City may provide an alternative auxiliary aid or service where the City can demonstrate that the means chosen by the individual is not required.

d)    **Signage & Notice:**  In each City facility where auxiliary communication aids or assistive listening systems are permanently or regularly provided, the City shall post appropriate signage indicating the location where such materials are requested and/or provided.

e)    **Closed Captioning Television Decoders:**  All newly-purchased televisions utilized at City-sponsored events, training, and/or educational classes are held, will be equipped with closed captioning decoders, so that individuals with hearing impairments have an equal opportunity for television viewing as those without hearing impairments.

f)    **Portable Assistive Listening Equipment:**  The City shall ensure that at least two (2) portable assistive listening devices are readily available and maintained in operable condition.  These portable devices may be used at any City facility where such a device is requested for participation in a City program, event, or activity.  The City shall implement procedures ensuring that such devices are readily available and can be readily dispersed to any location where needed, based upon a timely request and availability of the devices.  All public meeting notices shall contain a provision and instructions for requesting auxiliary aids and services in order to participate in public meetings.

g)    **Published ADA Notice:** Within **Nine (9) Months** of the entry of this Consent Decree, effective date of this Agreement, the City will adopt the attached Notice **[Attachment A]**; distribute it to all City department or agency heads; publish the Notice once in a local newspaper of general circulation serving the City; post the Notice on its Internet Home Page at http://www.ci.methuen.ma.us/ and post copies in conspicuous locations in its public buildings. It will refresh the posted copies, and update the contact information contained on the Notice, as necessary. Copies will also be provided to any person upon request.  The City will establish a link to www.ada.gov/websites2.htm, "Accessibility of State and Local Government Websites to People with Disabilities" on its official City of Methuen web site.

h)    **Police Department Communications:**  Within **Nine (9) Months** of the entry of this Consent Decree, the City will adapt for its own use and implement the *City of Methuen Police Department's Policy Statement on*

*Effective Communication with People Who Are Deaf or Hard of Hearing*
[**Attachment B** or in substantially similar format and wording to
**Attachment B**] and distribute to all department officers the *Guide for Law
Enforcement Officers When in Contact with People Who are Deaf or Hard
of Hearing* [**Attachment C** or in substantially similar format and wording
to **Attachment C**].

## C.    BARRIER REMOVAL PROJECTS TO BE PERFORMED

I.    **Accessibility of City Sidewalks and Intersections.** The City shall identify,

prioritize, seek public comment, and perform necessary improvements and new

construction to sidewalk and intersection locations that fail to provide access and use by

persons with disabilities by performing the following:

a)    **Public Comment and Self-Evaluation.** The City shall take
appropriate actions to seek public comment on the location and priority of
sidewalk and intersection locations that require improvements to provide
wheelchair accessibility. **Within ninety days of the effective date of this
Consent Decree,** the City shall hold a properly noticed public hearing,
inviting members of the public to attend and comment on locations in City
that might need accessibility modifications (i.e. curb cuts). The City shall
include identified locations within a prioritized list of sidewalk and
intersection locations that require accessibility improvements. The City
shall also solicit input from Merrimack Valley Regional Transit Authority
on locations in City that might need accessibility modifications (i.e. curb
cuts). The City shall specifically seek commentary on the locations of
Merrimack Valley Regional Transit Authority (**MVRTA**) bus stop
locations that require sidewalk improvement, sidewalk installation, or
intersection curb cuts to provide and/or increase wheelchair accessibility.
The City shall also conduct an independent self-evaluation of accessibility
modifications (i.e. curb cuts) in conjunction with comments received at
public hearing and from MVRTA, if any, to identify "priority locations."
The identification of needed accessibility modifications shall be completed
within **Twelve months** of the entry of this Consent Decree and all
necessary accessibility modifications and curb cuts shall be made on
"priority locations" within **Thirty-Six months** of the entry of this Consent
Decree.

The parties acknowledge that the purpose of the public hearing referenced
above is to solicit public comment, which comments are advisory in nature
only, and in no way are meant to define the scope of the City's obligations
in this regard. Further, the parties acknowledge that the City shall not be

obligated by virtue of the comments received at the public hearing to adopt or implement any changes/modifications as requested by the public at the hearing; and that the determination as to "priority locations" is a determination to made solely in the discretion of the City, in accordance with the requirements of the ADA.

b)    Whenever the City constructs or alters a City street or road, as defined under the ADA/ADAAG, it shall install ADA compliant curb cuts as part of the project; appropriate funding shall be included in all street repair projects for the installation of ADA compliant curb cuts within the area of the street that is to be repaired.  Beginning no later than three months after the effective date of this Agreement, whenever a new street, road, or highway is constructed or altered, the City will provide curb ramps or other sloped areas complying with the Standards or UFAS at any intersection having curbs or other barriers to entry from a street level pedestrian walkway.  For purposes of this Consent Decree, resurfacing beyond normal maintenance is considered an alteration. Merely filling potholes, and "microsurfacing," are considered normal maintenance for purposes of this Consent Decree.

c)    **Disabled Parking Improvements and Addition of Requisite Spaces.**  The parties agree that the City shall complete all necessary improvements to City-owned disabled parking spaces, signage, and improvements to provide wheelchair accessible safe paths of travel that serve City-owned disabled parking spaces, and shall complete the addition of new City-owned disabled parking spaces to meet the requisite allotment and dispersal requirements of the ADAAG within **Nine (9) months** of entry of this Consent Decree, unless the provision of such spaces and/or signage is part of a larger renovation project, in which case the City has **Thirty-Six months** to improve and/or add the necessary parking spaces.

d)    **Disabled Parking Spaces.**  The City shall make necessary alterations to ensure that existing disabled parking spaces fully comply with dimensional, signage, and location requirements, in accordance with applicable design standards.  The City shall ensure that disabled parking spaces directly connect with an accessible route to an accessible entrance of the facility or to an entrance to the facility soon to be made accessible as set forth below.

**II.    Searles Building, 41 Pleasant Street:** Within **Twelve months** following the entry of this Consent Decree, the City shall take the following remedial measures to improve access for disabled persons at City Hall:

a)    The City shall provide above-grade signage identifying the van accessible space at the main public entrance on the parking lot side of the building as "Van Accessible";

b)    The automatic door-opener at the main public entrance on the parking lot side of the building shall be repaired and maintained in good working order;

c)    The ramp leading from the main public entrance on the parking lot side of the building has a slope between 7% and 3%. The ramp lacks a level landing at the top of the ramp run. The ramp shall be modified so that the area in front of the second interior door provides a level surface in compliance with ADAAG 4.13.6;

d)    At the accessible parking space provided on the Pleasant Street side of the Searles Building, the City shall designate the accessible space with an access aisle, designate the pedestrian path of travel, and repair all cracked pavement leading to the entrance on the Pleasant Street side of the building;

e)    There is a storm grate at the main public entrance on the parking lot side of the building. The grate creates a cross slope of 5.2%. The grate openings exceed ½". The City shall replace the storm grate with a grate having openings of ½" or less in compliance with ADAAG 4.5.4. The cross slope created by the storm grate shall be no greater than 2% in compliance with ADAAG 4.8.6;

f)    The wheelchair lift at the main public entrance on the parking lot side of the building is activated/deactivated with a key. The City shall provide a key at the lift that does not require tight pinching or grasping in compliance with ADAAG 4.27.4. The key shall be left in the "on" position during business hours;

g)    The City shall install lever handles on all doors to public offices inside the Searles Building. Such lever handles shall not require tight pinching or grasping in compliance with ADAAG 4.27.4;

h)    There is an emergency call phone on the elevator. The call phone is behind a door. The door shall be modified so that it does not require tight pinching or grasping to open in compliance with ADAAG 4.27.4;

i)    The transaction counters in all offices accessible to the public shall be lowered to a maximum height of 36," or auxiliary counters or tables at

or near all counters within the Searles Building where transactions take place shall be provided, in accordance with ADAAG 7.2(2);

j)      The City shall mount all office and rest room signs within the Searles Building 60" above the finished floor on the walls adjacent to the latch side of all office and rest room doors as per ADAAG 4.30. The City shall use signage having Braille characters and pictograms as per ADAAG 4.30.4;

k)      Within **Three (3) months** following the entry of this Consent Decree as an Order of the Court, the City shall inspect all bathroom sink plumbing in municipal buildings, including the Searles Building, to ensure that the drain pipes meet ADA/AAB requirements. The City shall take appropriate corrective measures to insulate or recess drain pipes that do not meet ADA/AAB requirements. At least one bathroom sink in all wheelchair accessible bathrooms shall have insulated or recessed drain pipes, where required by the ADA/AAB;

l)      The brochures and informational materials in the Economic and Community Development Department shall be relocated to an area permitting a clear floor approach in accordance with ADAAG 4.2.4 and shall be placed at a height permitting a maximum high forward reach of 48" as per ADAAG 4.2.5 and/or a maximum high side reach of 54" as specified in ADAAG 4.2.6. Alternatively, the City may move any furniture obstructing access to the brochures and informational material in its existing location;

m)      The City shall install a complying grab bar at the rear of the toilet in the unisex bathroom of the first floor of the Searles Building as per ADAAG 4.17.6.

n)      The City shall move the copy machine in the Mayor's Office to provide a 36" unobstructed path and the interior door to the Mayor's Office shall be widened to provide 32" of clear opening. Alternatively, the Mayor may meet persons in wheelchairs in an accessible location within the Searles Building; and

o)      The City shall ensure that assistive listening devices are available for any public meetings that take place in the meeting rooms at the Searles Building. Appropriate signage notifying persons of their availability shall be posted in a conspicuous place or places within the Searles Building.

**III.    Nevins Memorial Library, 305 Broadway:** Within **Twelve months** (or within such other time if specified below) after entry of this Consent Decree, the City shall take the following remedial measures to improve access for disabled persons at the Nevins Memorial Library:

a)      There are two curb cuts where the driveway from Broadway enters the parking lot of Nevins Memorial Library. The curb cut on the south side of the driveway entrance has a running slope between 9.2% and 11.4%. The cross slope of the curb cut on the south side is 5.7%. The curb cut on the north side has a running slope of between 4.4% and 14.4%. The cross slope of the curb cut on the north side varies from 6.5% to 9.5%. The City shall replace both curb cuts to bring them into compliance with ADAAG 4.7. The running slope of the curb cuts shall not exceed 8.3%. The cross slope shall not exceed 2%;

b)      The accessible entrance to the Library is in the rear parking lot. There are three accessible parking spaces including a van accessible space. The parking spaces have a slope of between 4.0% and 3.1%. The slope of the spaces should not exceed 2% in any direction as per ADAAG 4.6.6. The City shall re-grade the accessible parking spaces so that there is no more than a 2% slope in any direction;

c)      The main entrance to the accessible entrance of the Library has a second run with a slope at 9.0 to 9.4%, which exceeds the maximum permissible slope of 8.3% permitted under ADAAG 4.8.2. Within **Thirty-Six months** after entry of this Consent Decree, the City shall bring the ramp into the slope requirements of ADAAG 4.8.2. The parties acknowledge that the City has been attempting, and continues to attempt, to recover bond proceedings associated with the initial construction of this ramp, among other items at the Library, which the City contends were not constructed and/or installed in accordance with design specifications and/or standard good building practices. To this end, the parties recognize that further time to complete the corrections to the ramp may be necessary. However, no extensions of time for completion of the ramp shall be made except upon written agreement of all parties or by order of the Court. Therefore, the City may request that the plaintiffs will stipulate to enlarge the time to complete this task beyond Thirty-Six months due to uncertainty associated with obtaining bond funds. If the City requests an extension beyond Thirty-Six months, its attorney will provide the plaintiffs' attorney with a brief written statement of the City's efforts to complete the task within Thirty-Six months, the reason(s) for the delay in completing the task, and the amount of additional time beyond Thirty-Six months that is reasonably expected to be needed to complete the task;

d)      Elevator door hoistways lack Braille signage on levels U1 and U2. The City shall install raised and Brailled floor designations on both jambs on levels U1 and U2 as per ADAAG 4.10.5;

e)      The bathroom sink pipes on Level L1 shall be insulated as per ADAAG 4.24.6 where required;

      f)     The bathroom signage on the unisex rest room on Level U1 is installed on the door and not on the wall adjacent to the door. The City shall install signage on the adjacent wall on the latch side as per ADAAG 4.30.

**IV.    The Quinn Public Safety Building, 90 Hampshire Street:** Within **Twelve months** after entry of this Consent Decree, the City shall take the following remedial measures to improve access for disabled persons at the Quinn Public Safety Building:

      a)     There is a curb cut at the head of the access aisle connected to the accessible parking spaces. The curb cut has a slope that exceeds 8.3%. There is no level landing. The cross slope is between 4.0% and 4.4%. The curb ramp shall be reconstructed to comply with the slope and rise requirements of ADAAG 4.8.2 and the cross slope requirements of ADAAG 4.8.6. The landing above the ramp shall be made level;

      b)     The ramp leading into the police station has cracked pavement at its base. The City shall repair the cracked pavement to create a stable and firm ground surface in accordance with ADAAG 4.5.1;

      c)     There are double doors at the top of the ramp into the police station that have openings of 29 inches. The door pressure exceeds 15 pounds. The City shall either install one door at the entrance with a minimum clear opening of 32" in accordance with ADAAG 4.13.5 or the City shall install an automatic door opening device that would open both doors simultaneously;

      d)     The sidewalk and ramp leading into the police station from the public sidewalk is cracked. The City shall repair the cracked pavement to create a stable and firm ground surface in accordance with ADAAG 4.5.1; and

      e)     The counters at the Police Information Counter and the Records Department are both 44-48" above the finished floor with no lowered sections. The counters shall be lowered to a maximum height of 36" or the City shall provide auxiliary counters in accordance with ADAAG 7.2(2).

**IV.    Raymond J. Martin Park/Riverside Park/Water Treatment Plant, Riverside Drive:** Within **Twelve months** after entry of this Consent Decree, the City shall take the

following remedial measures to improve access for disabled persons at the Raymond J. Martin Park/Riverside Park/Water Treatment Plant:

> a) Designate a "Van Accessible" parking space with an 8' access aisle adjacent to it, an above ground sign identifying the space as "Van Accessible" and stripe the surface to demarcate the space clearly.

**V.    Henry P. Schreunder Park:** The plaintiffs agree that this is an undeveloped area where no service or program of the City is offered. No alterations or modifications are to be provided under this Consent Decree.

**VI.    Forest Lake Park:** Within **Twelve months** after entry of this Consent Decree, the City shall take the following remedial measures to improve access for disabled persons at the Forest Lake Park:

> a) The City shall provide above-grade signage identifying the van accessible space as "Van Accessible";

> b) The picnic table has extended sides for access by a wheelchair, but the paved area around the table provides less than 36" of clear passage space as recommended by the Access Board. The City shall re-position the table or re-pave the area to create 36" of clear passage space.

**VII.    Methuen Square:** Within **Twelve months** after entry of this Consent Decree, the City shall take the following remedial measures to improve access for disabled persons at Methuen Square:

> a) The City shall repair and maintain in good working condition all pedestrian crosswalk signals in Methuen Square.

**VIII.    Oakland Avenue/Lowell Street**: Within **Thirty-Six months** after entry of this Consent Decree, the City shall take the following remedial measures to improve access for disabled persons in the Oakland Avenue and Lowell Street area:

> a) The sidewalk at the Richard G. Kelly Memorial Bridge on the Oakland Avenue Extension usually is blocked by an overgrowth of weeds. The sidewalk pavement is cracked. The City shall repair the cracked pavement to create a stable and firm ground surface in accordance with ADAAG 4.5.1. The City shall keep the sidewalk clear of overgrowth of

vegetation to maintain a minimum clear width on the sidewalk of 36" in accordance with ADAAG 4.3.3;

b)      The City shall repair and/or replace the sidewalks along Oakland Avenue, beginning at 200 Oakland Avenue and continuing down to the four corners of Oakland Avenue and Lowell Street.  ADAAG compliant curb cuts shall be installed at each corner at the intersection of Lowell Street and Oakland Avenue;

c)      The Lowell Street sidewalk from Oakland Avenue to the Senior Center has severely broken pavement.  The City shall repair and/or replace the cracked pavement to create a stable and firm ground surface in accordance with ADAAG 4.5.1; and

d)      The City shall install curb cuts along Lowell Street from Oakland Avenue to Methuen Square, specifically (without limitation) at the intersections with the following streets:  Closson Court, Ruskin Avenue, Field Avenue, Elsmere Avenue, Pinedale Avenue, School Street, and Barker Street.  The curb cuts shall comply with the ADAAG and/or the Rules and Regulations of the Architectural Access Board.

e)      The parties acknowledge that the time for completion of these road projects will be dependent, in part, upon the availability of so-called "Chapter 90" funds held by the City. Said funds are previously appropriated and earmarked for a particular project or purpose. To this end, the parties recognize that further time may be required to complete the modifications referenced above due to lack of funding.  However, no extension of time should be made except upon a written agreement of all parties or by Order of the Court.

**VIV.  Jackson Street/East Street**:  Within **Thirty-Six months** after entry of this Consent Decree, the City shall take the following remedial measures to improve access for disabled persons in the Jackson Street and East Street area:

a)      The City shall repair and/or replace the sidewalks along the south side of East Street beginning at the intersection of Jackson and continuing until Lawrence Street.

b)      Sections of the Jackson Street sidewalk are 24" to 26" wide. Sections of the west sidewalk have broken pavement. The City shall repair and/or replace the west sidewalk and expand the sidewalk to a minimum clear width of 36" in accordance with ADAAG 4.3.3 beginning

17

at the intersection of East Street and heading north until the state road begins; and

c)      Curb cuts that are compliant with the ADAAG and/or the Rules and Regulations of the Architectural Access Board shall be installed along East Street at the following intersections: Jackson Street, Larchwood Road, Kenwood Road, Brewster Terrace, Pinewood Road, Beedle Terrace and Locust Road.

d)      The parties acknowledge that the time for completion of these road projects will be dependent, in part, upon the availability of so-called "Chapter 90" funds held by the City. Said funds are previously appropriated and earmarked for a particular project or purpose. To this end, the parties recognize that further time may be required to complete the modifications referenced above due to lack of funding.  However, no extension of time should be made except upon a written agreement of all parties or by Order of the Court.

## D.    **ENFORCEMENT PROVISIONS**

a.      **Retention of Jurisdiction.**  The parties agree that the effective date of this Consent Decree shall be the date when the Court endorses the Consent Decree and enters it as an Order of the Court.  The Consent Decree shall remain in effect until the City has achieved full compliance with the terms of this Consent Decree.  The parties agree that the Court shall retain jurisdiction over this Consent Decree for purposes of enforcement, the resolution of any dispute that may arise under this Consent Decree, and for the entry of any further orders as may be appropriate.

b.      **Informal Resolution of Disputes.**  The plaintiffs may review compliance with any portion of this Consent Decree at any time upon reasonable written notice and request to the City.  If the plaintiffs believe that this Consent Decree, or any requirement thereof, has not been met, plaintiffs shall notify the City in writing and shall first attempt to resolve the issues in good faith.  If the plaintiffs are unable to reach a satisfactory resolution of the issues raised within thirty days of the written notice, the plaintiffs may elect to seek enforcement and/or injunctive relief by judicial intervention.

18

c.  **Injunctive Relief**.  In the event the barrier removal, alterations and modifications required hereby are not timely completed in all respects, the plaintiffs shall be entitled to petition the Court for injunctive relief as requested in the Complaint filed in this action. Additionally, in any action to enforce this Consent Decree, the prevailing party shall be entitled to petition the Court for their reasonable attorney's fees, expert's fees, costs and litigation expenses.

d.  **Waiver**.  Failure by the plaintiffs to enforce any individual provision, requirement or deadline delineated within this Consent Decree shall not be construed as a waiver of the plaintiffs' right to enforce any other provision, requirement or deadline of this Consent Decree.

e.  **Interim Status Reports from the City**.  Upon the completion of the accessibility requirements and barrier removal requirements set forth in this Consent Decree, at the yearly anniversary dates from the effective date of this Consent Decree, the City shall notify the Court and/or place on file with the City Clerk for public inspection written reports of such completion and shall afford the plaintiffs' representatives reasonable access to City facilities to verify completion of the work required hereby, or to inspect the work's progress and/or compliance with this Consent Decree and applicable accessibility standards.

f.  **Retention of Records**.  The City shall retain during the life of this Consent Decree records required by this Consent Decree, and any other records necessary to document the implementation of and continued compliance with this Consent Decree. The City shall allow counsel for the plaintiffs to review and copy such records upon reasonable notice.

**E.**    **DAMAGES, ATTORNEYS' FEES, CASE EXPENSES AND COSTS**

For purposes of this Consent Decree, reference is made to a Separate Letter Agreement of the parties.

**F.**    **RELEASE OF CLAIMS**

The plaintiffs hereby release the City from claims that were made or which could have been made in the above-captioned case pursuant to Title II of the ADA, Section 504 of the Rehabilitation Act, Article 114 of the Massachusetts Constitution, and Massachusetts General Laws c. 93 § 103, *provided that*, this Consent Decree shall in no way limit the plaintiffs' ability to monitor and enforce the defendant's compliance with the terms hereof.  In consideration of, and consistent with, the terms of this Consent Decree, the plaintiffs will stipulate to a dismissal with prejudice regarding all matters contained within the Complaint and in this Consent Decree, except as provided in section D entitled "Enforcement Provisions" above.

**G.**    **MODIFICATION**

a.    This Consent Decree may not be modified except by order of this Court.  If at any time the City desires to modify any portion of this Consent Decree because of changed conditions making performance impossible or impractical or for any other reason, it will promptly notify the plaintiffs in writing, setting forth the facts and circumstances believed to justify modification and the substance of the proposed modification.  The parties shall use their best efforts to reach an agreement and shall submit to the Court a stipulation for modification of Consent Decree.  Until there is a stipulation and Order approving the proposed modification, the proposed modification will not take effect  If

the parties are unable to stipulate to a proposed modification of this Consent Decree, the City may file a motion for modification.

**H.**    **ENTIRE UNDERSTANDING**

a.    This Consent Decree constitutes the entire understanding and agreement of the parties and supersedes all prior or contemporaneous negotiations or agreements (written or oral) and cannot be modified, amended or revoked except by the express written consent of all parties.  The foregoing sentence, however, does not nullify the enforceability of the Separate Letter Agreement (Part E above) regarding damages, fees, expenses, and costs.  This Consent Decree does not purport to remedy any other potential violations of the ADA or any other federal law.  This Consent Decree does not affect the City's continuing responsibility to comply with all applicable requirements of the ADA.

b.    This Agreement is a public document.  The City shall make available upon the request of any person a copy of this document or any information contained in it.

**I.**    **SEVERABILITY**

If any provision of this Consent Decree or any part of any provision of this Consent Decree is found to be invalid by a court of competent jurisdiction, such shall not affect the validity of any other provisions or parts of this Consent Decree.

**J.**    **CONSTRUCTION/ AMBIGUITIES**

The parties acknowledge that each party has reviewed and revised this Consent Decree and that the normal rule of construction, to the effect that any ambiguities are to be resolved against the drafting party, shall not be employed in its interpretation.

## K.    EXECUTION

The parties have read and understood the preceding Consent Decree, have had the opportunity to discuss it with legal counsel, and have voluntarily agreed to sign the Consent Decree and to be bound by its terms. The Methuen ~~City Council and~~ Mayor has ~~have~~ approved this Consent Decree. Each person executing this Consent Decree on each party's behalf represents that they are duly authorized to sign on behalf of the respective party and to bind each to the terms of the Consent Decree.

IN WITNESS WHEROF, the parties hereto execute this Consent Decree, regarding the removal of program access barriers to government programs, facilities, services and activities, ADA Title II compliance, Rehabilitation Act Section 504 compliance, and the release of all claims against and between the respective parties, to be effective upon which the last signatories execute this Consent Decree and it is properly entered by the Court.

Amylee O'Beirne, as a Director of
Access with Success, Inc.
70 Donahue Road
Dracut, MA 01826
By Power of Attorney to
Nicholas S. Guerrera (attached hereto)

Dated: 3/6/06

Robert L. Smith, III
200 Oakland Avenue
Methuen, MA 01844

Dated: 3/6/06

William M. Manzi, III, Mayor
Mayor's Office
41 Pleasant Street, Room 305
Methuen, MA 01844

Dated: 3/16/06

Robert Brearley
20 Calumet Road, Bldg. 1, Apt. E
Methuen, MA 01844

Dated: 3/6/06

22

**It is so ORDERED, this**     **day of**        **2006**

_____

Robert B. Collings, United States Magistrate Judge

## ATTACHMENT A

NOTICE UNDER THE AMERICANS WITH DISABILITIES ACT

In accordance with the requirements of title II of the Americans with Disabilities Act of 1990, the City will not discriminate against qualified individuals with disabilities on the basis of disability in the City's services, programs, or activities.

Employment: The City does not discriminate on the basis of disability in its hiring or employment practices and complies with all regulations promulgated by the U.S. Equal Employment Opportunity Commission under title I of the Americans with Disabilities Act (ADA).

Effective Communication: The City will generally, upon request, provide appropriate aids and services leading to effective communication for qualified persons with disabilities so they can participate equally in the City's programs, services, and activities, including qualified sign language interpreters, documents in Braille, and other ways of making information and communications accessible to people who have speech, hearing, or vision impairments.

Modifications to Policies and Procedures: The City will make all reasonable modifications to policies and programs to ensure that people with disabilities have an equal opportunity to enjoy all City programs, services, and activities. For example, individuals with service animals are welcomed in City offices, even where pets are generally prohibited.

Anyone who requires an auxiliary aid or service for effective communication, or a modification of policies or procedures to participate in a City program, service, or activity, should contact the office of [name and contact info for ADA Coordinator] as soon as possible but no later than two weeks before the scheduled event.

The ADA does not require the City to take any action that would fundamentally alter the nature of its programs or services, or impose an undue financial or administrative burden.

Complaints that a City program, service, or activity is not accessible to persons with disabilities should be directed to [Name and contact information of ADA Coordinator].

The City will not place a surcharge on a particular individual with a disability or any group of individuals with disabilities to cover the cost of providing auxiliary aids/services or reasonable modifications of policy, such as retrieving items from locations that are open to the public but are not accessible to persons who use wheelchairs.

**ATTACHMENT B**

**METHUEN POLICE DEPARTMENT POLICY STATEMENT
REGARDING EFFECTIVE COMMUNICATION
WITH PEOPLE WHO ARE DEAF OR HARD OF HEARING**

OVERVIEW

It is the policy of the Methuen Police Department to ensure that a consistently high level of service is provided to all community members, including those who are deaf or hard of hearing. This Department has specific legal obligations under the Americans with Disabilities Act and the Rehabilitation Act. To carry out these policies and legal obligations, the Department instructs its officers and employees as follows:

- People who are deaf or hard of hearing are entitled to a level of service equivalent to that provided hearing persons.

- The Department will make every effort to ensure that its officers and employees communicate effectively with people who are deaf or hard of hearing.

- Effective communication with a person who is deaf or hard of hearing involved in an incident -- whether as a victim, witness, suspect, or arrestee -- is essential in ascertaining what actually occurred, the urgency of the matter, and type of situation.

- Various types of communication aids – known as "auxiliary aids and services" – are used to communicate with people who are deaf or hard of hearing. These include use of gestures or visual aids to supplement oral communication; an exchange of written notes; use of a computer or typewriter; use of assistive listening devices (to amplify sound for persons who are hard of hearing); or use of qualified oral or sign language interpreters.

- The type of aid that will be required for effective communication will depend on the individual's usual method of communication, and the nature, importance, and duration of the communication at issue.

- In many circumstances, oral communication supplemented by gestures and visual aids, an exchange of written notes, use of a computer or typewriter, or use of an assistive listening device may be effective. In other circumstances, qualified sign language or oral interpreters are needed to communicate effectively with persons who are deaf or hard of hearing. The more lengthy, complex, and important the

communication, the more likely it is that a qualified interpreter will be required for effective communication with a person whose primary means of communication is sign language or speech reading. For example:

– If there has been an incident and the officer is conducting witness interviews, a qualified sign language interpreter may be required to communicate effectively with someone whose primary means of communication is sign language.

– If a person is asking an officer for directions to a location, gestures and an exchange of written notes will likely be sufficient to communicate effectively.

- To serve each individual effectively, primary consideration should be given to the communication aid or service that works best for that person. Officers must ask persons who are deaf or hard of hearing what type of auxiliary aid or service they need. Officers must defer to those expressed choices, unless there is another equally effective way of communicating, given the circumstances, length, complexity, and importance of the communication, as well as the communication skills of the person who is deaf or hard of hearing.

- The Department is not required to provide a particular auxiliary aid or service if doing so would fundamentally alter the nature of the law enforcement activity in question, or if it would cause an undue administrative or financial burden. Only the Department head or his or her designee may make this determination. For example:

– If the Department has limited financial resources and providing a particular auxiliary aid would cost a large sum of money, the Department head may determine that it would be an undue financial burden (note: the Department's budget as a whole must be considered). In this situation, the most effective means of communication that does not involve an undue burden must be used.

- The input of people who are deaf or hard of hearing who are involved in incidents is just as important to the law enforcement process as the input of others. Officers must not draw conclusions about incidents unless they fully understand -- and are understood by -- all those involved, including persons who are deaf or hard of hearing.

- People who are deaf or hard of hearing must never be charged for the cost of an auxiliary aid or service needed for effective communication.

<u>ON-CALL INTERPRETIVE SERVICES</u>

- The Department will maintain a list of sign language and oral interpreting services that are available (on-call 24 hours per day) and willing to provide qualified interpreters as needed. Each of these services will be chosen after having been

screened for the quality and skill of its interpreters, its reliability, and other factors such as cost. The Department will update this list annually.

- A qualified sign language or oral interpreter is one who is able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary. Accordingly, an interpreter must be able to sign to the deaf individual (or interpret orally to the person who does not use sign language) what the hearing person is saying and to voice to the hearing person what is being signed or said by the deaf individual. The interpreter must be able to interpret in the language the deaf person uses (e.g., American Sign Language or Signed English) and must be familiar with law enforcement terms and phrases. Because a qualified interpreter must be able to interpret impartially, a family member, child, or friend of the individual who is deaf may not be qualified to render the necessary interpretation because of factors such as professional, emotional, or personal involvement, or considerations of confidentiality. Additionally, although a "qualified" interpreter may be certified, a certified interpreter is not necessarily "qualified," if he or she is not a good communications match for the deaf person (e.g., where the deaf person uses Signed English and the interpreter uses American Sign Language) or the situation (e.g., where the interpreter is unfamiliar with law enforcement vocabulary). Certification is not required in order for an interpreter to be "qualified."

## TTY AND RELAY SERVICES

In situations when a non-disabled person would have access to a telephone, officers must provide persons who are deaf or hard of hearing the opportunity to place calls using a text telephone (TTY, also known as a telecommunications device for deaf people, or TDD). Officers must also accept telephone calls placed by persons who are deaf or hard of hearing through the Telecommunications Relay Service.

## TECHNIQUES FOR OFFICERS TO COMMUNICATE EFFECTIVELY

- Officers must review and have a working knowledge of Guide for Law Enforcement Officers When In Contact With People Who Are Deaf or Hard of Hearing. This document reviews how officers should communicate effectively in the types of situations officers will encounter. These situations include:

– Issuing a non-criminal or motor vehicle citation.
  – Communicating with a person who initiates contact with an officer.
  – Interviewing a victim or critical witness to an incident.
  – Questioning a person who is a suspect in a crime.
  – Making an arrest or taking a person into custody.

– Issuing Miranda Warnings to a person under arrest or in custody.
– Interrogating a person under arrest or in custody.

## PROCEDURES FOR OBTAINING AUXILIARY AIDS AND SERVICES

Officers must utilize the following auxiliary aids, when available, to communicate effectively:

-      Use of gestures

-      Use of visual aids

-      Exchange of written notes

-      Use of computers or typewriters

-      Use of assistive listening devices

-      Use of teletypewriters (TTY's)

-      Use of qualified oral or sign language interpreters

28

## ATTACHMENT C

## METHUEN POLICE DEPT. GUIDE FOR LAW ENFORCEMENT OFFICERS

As a law enforcement officer, you can expect to come into contact with people who are deaf or hard of hearing.

Title II of the Americans with Disabilities Act (ADA) of 1990 prohibits State and local government from discriminating against an individual with a disability. Municipal and State police and county sheriff departments are bound by this Federal law. Your office has adopted a more detailed policy regarding law enforcement officers' communication with people who are deaf of hard of hearing. You should become familiar with this policy.

What does title II require of you when interacting with persons who are deaf or hard of hearing? Among other things, your communication with such an individual must be as effective as your communication with hearing people.

How do you communicate? Provide aids or services as necessary to ensure that the deaf or hard of hearing individual understands what you are saying and that you understand him or her. These can include:

- use of qualified sign language or oral interpreters

- for people who are hard of hearing, speaking loudly and clearly, and use of assistive listening devices (to amplify sound)

- use of gestures or visual aids to supplement oral communication

- an exchange of written notes

- or use of a computer or typewriter.

What method of communication should you use? The law requires you to give primary consideration to the individual's preference. Ask how the person wishes to communicate.

For example, some people who are deaf do not use sign language and may need to use a different aid or rely on lip-reading. In one-on-one communication with an individual who reads lips, an officer should face the individual directly, and should ensure that the communication takes place in a well-lighted area.

Honor the individual's choice unless it would significantly interfere with your law enforcement responsibilities or you are confident that other means of communicating that

may be easier to provide are just as effective. Remember that deaf or hard of hearing persons must be able to understand you as well as those who do not have hearing impairments.

DO NOT ask a family member or friend to interpret for a deaf individual unless it is urgent to communicate immediately and that is the only option. If the deaf person requests that arrangement and the other person agrees, however, you can proceed.

How do you know when you are communicating clearly to an individual who is deaf or hard of hearing? Ask the person to summarize what you are saying. Test his or her understanding.

If the person uses sign language, what kinds of communication require an interpreter? Consider the length, importance, and complexity of the communication, as well as the context.

In a simple encounter, such as checking a driver's license or giving directions, a notepad and pencil or perhaps gestures will normally be sufficient.

During interrogations and arrests, a sign language interpreter will often be necessary.

If the legality of a conversation will be questioned in court, such as where Miranda warnings are issued, a sign language interpreter may be necessary. You should be careful about misunderstandings in the absence of a qualified interpreter. A nod of the head may be an attempt to appear cooperative in the midst of misunderstanding, rather than consent or a confession of wrongdoing.

In general, if an individual who does not have a hearing disability would be subject to police action without interrogation, then an interpreter will not be required, unless one is necessary to explain the action being taken.

Example: An officer clocks a car on the highway driving 15 miles above the speed limit. The driver, who is deaf, is pulled over and issued a non-criminal citation. The individual is able to understand the reasons for the citation, because the officer exchanges notes and points to information on the citation. A sign language interpreter is not needed.

Example: An officer responds to an aggravated battery call and upon arriving at the scene observes a bleeding victim and an individual holding a weapon. Eyewitnesses observed the individual strike the victim. The individual with the weapon is deaf, but the officer has probable cause to make a felony arrest without an interrogation. An interpreter is not necessary to carry out the arrest.

Example: An officer responds to the scene of a domestic disturbance. The husband says the wife has been beating their children and he has been trying to restrain

her. The wife, who is deaf, requests an interpreter. The officer begins by exchanging notes but the woman's responses indicate a lack of comprehension and poor grammar. An interpreter is necessary to carry out any arrest. In this situation, it would be inappropriate to use a family member to assist with communication, even if it is offered.

Do you have to take a sign language interpreter to a call about a violent crime in progress or a similar urgent situation involving a person who is deaf? No. An officer's immediate priority is to stabilize the situation. If the person being arrested is deaf, the officer can make an arrest and call for an interpreter to be available later at the booking station.

Contact numbers for your local sign language interpreters:

_____

_____

_____